IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION


THOMAS C. O'BRYANT,
      Plaintiff,

vs.                                                    Case No. 5:05cv131/RS/EMT

JASON LANGFORD, et al.,
      Defendants.
_____/

## REPORT AND RECOMMENDATION

     This case filed pursuant to 42 U.S.C. § 1983 is now before the court upon Defendants'
Motion for Summary Judgment and supporting documents (Docs. 164, 167, 168).  Plaintiff, an
inmate of the Florida correctional system proceeding pro se and in forma pauperis, filed a response
in opposition to the motion and supporting documents (Docs. 169, 170).  Upon review of the parties'
submissions, it is the opinion of the undersigned that the motion for summary judgment filed by
Defendants should be granted.

I.      PROCEDURAL HISTORY

     Plaintiff filed his amended complaint alleging Defendants violated his First and Eighth
Amendment rights by arranging for another inmate, specifically, Larry Lewis, to attack him in
retaliation for Plaintiff's filing grievances (Doc. 8).  As relief, Plaintiff seeks nominal damages in
the amount of $1.00 from each Defendant, punitive damages in the amount of $50,000.00 from each
Defendant, compensatory damages in the amount of $50,000.00, and court costs (*id.* at 18–19).  The
court previously dismissed Plaintiff's claims against Defendants in their official capacities, as well
as Plaintiff's Eighth Amendment claim against Defendant Pippin in his individual capacity (*see* Doc.
77).

Defendants, in their motion for summary judgment, assert that they are entitled to summary judgment on Plaintiff's retaliation claim because he has failed to make a prima facie showing of a causal connection between his filing of grievances and the movement of Inmate Lewis to his cell and subsequent assault (Doc. 164 at 11, 14–32).   Likewise, Defendants contend they are entitled to summary judgment on Plaintiff's Eighth Amendment claim because he failed to show a causal connection between Defendants' conduct and the assault by Inmate Lewis (*id*. at 13–32). Additionally, they argue that they are entitled to qualified immunity because the evidence does not show a constitutional violation (*id*. at 34–35).

II.    FACTS

The court conveys as facts those factual allegations of Plaintiff's verified amended complaint (Doc. 8), Defendants' affidavits in support of their motions for summary judgment, including attachments (Docs. 164, 167, 168), and Plaintiff's affidavits in support of his response to Defendants' summary judgment motion (Docs. 169, 170), to the extent those facts are undisputed and comply with the requirements for affidavits specified in Rule 56 — that they "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Fed. R. Civ. P. 56(e); *see, e.g.*, Dickinson v. Wainwright, 626 F.2d 1184, 1186 (5th Cir. 1980); Murrell v. Bennett, 615 F.2d 306, 310 n.5 (5th Cir. 1980).

At all times relevant to this action Plaintiff was an inmate at Holmes Correctional Institution (HCI).  In October of 2004,  Plaintiff filed a grievance against Defendant Segers concerning Segers allegedly unprofessional conduct during a counseling session with Plaintiff, and from October through December Plaintiff pursued the administrative appeals process concerning this grievance (Doc. 170, Ex A., Affidavit of Thomas O'Bryant ¶ 8).  On December 10, 2004, Defendant Segers came to Plaintiff's cell, threw one of the grievances on Plaintiff's bunk, and left (*id.*  ¶ 9).

On December 13, 2004, Defendant Finch conducted a search of Plaintiff's cell (Doc. 170, Ex. A, O'Bryant Aff. ¶ 10; Doc. 167, Ex. A, Declaration of M.D. Finch ¶ 7).  Cell searches are done routinely for security and safety reasons and are conducted at the discretion of security staff (Doc. 167, Ex. A, Finch Decl. ¶ 7).  It appeared to Defendant Finch that Plaintiff was standing lookout at the door of his cell, and Defendant Finch believed that some contraband may have been secreted in

Plaintiff's cell (*id.*).  Defendant Finch found a bottle of whiteout in Plaintiff's property that was not authorized (*id.*).  Shortly thereafter, Plaintiff filed a grievance against Defendant Finch alleging retaliation (Doc. 170, Ex. A, O'Bryant Aff. ¶ 94).  Plaintiff did not receive a response to the grievance (*id.*).  On December 15, 2004, Plaintiff was interviewed by Defendant Pippin and Inspector Cecil Smith regarding Plaintiff's placement in confinement pending a disciplinary report that had been filed against him (Doc. 170, Ex. A, O'Bryant Aff. ¶¶ 17–20).

On December 14 and 17, 2004, Plaintiff received disciplinary reports for Disrespect to Officials (Doc. 167, Ex. A, Finch Decl. ¶ 5, attachments).  Defendant Finch did not issue or cause to be issued either of these disciplinary reports (*id.*, Finch Decl. ¶¶ 5–6, attachments).

In March of 2005, Plaintiff filed a grievance against Defendant Durrance complaining that Durrance failed to properly supervise the officers under his command (Doc. 170, Ex. A, O'Bryant Aff. ¶ 93).  The grievance was not answered (*id.*).  On March 29, 2005, Plaintiff was placed in confinement for another alleged rule violation (Doc. 170, Ex. A, O'Bryant Aff. ¶ 28).  Defendant Finch went to Plaintiff's housing unit to pack and inventory Plaintiff's property, and included in Plaintiff's property was a § 1983 complaint which named Defendant Finch as the "lead defendant" (*id.* ¶¶ 29–31).

On April 22 or 23, 2005, Plaintiff filed a grievance against Defendants Segers and Langford for allegedly refusing to turn the lights out nearly one hour after they were supposed to do so (Doc. 170, Ex. A, O'Bryant Aff. ¶ 92).  Defendant Langford gave the grievance back to Plaintiff on April 28, 2005 (*id.*).

At approximately noon on April 27, 2005, Plaintiff's cellmate, Inmate Michael Anderson, was moved from cell #H2118 to cell #H2117, which was occupied by Inmate Claude Hughes (Doc. 170, Ex. R, Affidavit of Claude Hughes ¶ 5).  Inmate Larry Lewis was moved from cell #H2105 to Plaintiff's cell, cell #H2118 (Doc. 170, Ex. A, O'Bryant Affidavit ¶ 39, Doc. 167, Ex. F).  On April 27, during the shift when Inmate Lewis was moved to Plaintiff's cell, Defendants Finch, Langford, and Segers were not on duty (Doc. 167, Ex. A, Finch Decl. ¶ 4; Doc. 37, Affidavit of Jason Langford ¶ 3, Affidavit of Ronnie Segers ¶ 4).

On April 29, 2005, Inmate Lewis approached Plaintiff from behind and struck him on the right side of his face with his closed fist (Doc. 170, Ex. A, O'Bryant Affidavit ¶ 63).  The left side of Plaintiff's face struck the wall as a result of the force of Lewis's punch (*id.* ¶ 64).  As Plaintiff turned to face Lewis, Lewis punched him in the face again, causing Plaintiff to trip over the toilet and fall (*id.* ¶ 65).  While Plaintiff was on the floor, Lewis continued to repeatedly punch and kick him (*id.* ¶ 67).  Officers Slay and Gilley arrived at the cell and broke up the attack (*id.* ¶ 69).  Lewis and Plaintiff were removed from the cell and locked in the showers (*id.* ¶ 70).  Plaintiff's injuries included two abrasions on his back, three cuts above his left eye, one cut on the right side of his forehead, one cut above his left ear, one cut on his right cheek, swelling on his left temple, bruising on his left calf, left thigh, and right thigh, swelling in several places, a black eye, and sharp pain in the left side of his face near his temple when he opened his mouth (*id.* ¶¶ 71–74).  While in the shower, a picture was taken of Plaintiff's bloodied face (*id.* ¶ 71).  Plaintiff was seen by Nurse Whitehurst, who documented and treated his injuries (*id.*, ¶ 72, Ex. E).  Plaintiff was then returned to his cell (*id.*, Ex. A, O'Bryant Aff. ¶ 77).  Later that evening, Plaintiff experienced severe headaches, dizziness, tunnel vision and "seeing stars," disorientation, nausea, and vomiting (*id.* ¶ 76).  Inmate Lewis and his original cellmate were moved to cell #H2220 (*id.*, Ex. —15).  On May 4, 2005, Plaintiff was still experiencing headaches, pain in his jaw, and nausea (*id.*, Ex. A, O'Bryant Aff. ¶ 86).  Inmate Lewis was issued a disciplinary report for unarmed assault and received 60 days in disciplinary confinement (Doc. 164, Ex. G, Deposition of Larry Lewis p. 23, lines 21–25, p. 24, lines 1–6).

## III.   LEGAL STANDARDS

### A.   Summary Judgment Standard

In order to prevail on their motion for summary judgment, Defendants must show that Plaintiff has no evidence to support his case or present affirmative evidence that Plaintiff will be unable to prove his case at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986).  If Defendants successfully negate an essential element of Plaintiff's case, the burden shifts to Plaintiff to come forward with evidentiary material demonstrating a genuine issue of fact for trial.  *Id.*  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing [substantive] law." *Id.*; *accord* Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992).  Further, Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence or conclusory allegations is insufficient.  Celotex Corp., 477 U. S. at 324 (quoting Fed. R. Civ. P. 56(e)).  Plaintiff must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.*; Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997) ("Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by h[is] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'") (quoting Celotex Corp., 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(c), (e))); Hammer v. Slater, 20 F.3d 1137 (11th Cir. 1994).  The Eleventh Circuit has consistently held that conclusory allegations without specific supporting facts have no probative value, and are legally insufficient to defeat summary judgment. *See* Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 (11th Cir.2000); Sammons v. Taylor, 967 F.2d 1533, 1544-45 & n. 5 (11th Cir. 1992).

Evidence presented by Plaintiff in opposition to the motion for summary judgment, and all reasonable factual inferences arising from it, must be viewed in the light most favorable to Plaintiff. Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970); Jones v. Cannon, 174 F.3d 1271, 1282 (11th Cir. 1999).  A motion for summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; Celotex Corp., 477 U.S. at 322.

   B.  First Amendment Standard

In his amended complaint, Plaintiff claims that Defendants violated the First Amendment by retaliating against him for filing grievances.  It is well established that the First Amendment forbids prison officials from retaliating against prisoners for exercising the right of free speech. Crawford-El v Britton, 523 U.S. 574, 588 n.10, 592, 118 S. Ct. 1584, 140 L. Ed. 2d 759 (1998); Farrow v. West, 320 F.3d 1235, 1248 (11th Cir. 2003) (citations omitted); Adams v. James, 784 F.2d 1077, 1080 (11th Cir. 1986) (citation omitted); *see also* Mitchell v. Farcass, 112 F.3d 1483, 1490 (11th Cir. 1997); Wright v. Newsome, 795 F.2d 964, 968 (11th Cir. 1986).  "A prisoner can establish retaliation by demonstrating that the prison official's actions were the result of his having filed a grievance concerning the conditions of his imprisonment."  Farrow, 320 F.3d at 1248 (internal quotation and citation omitted).  However, broad, conclusory allegations of retaliation are insufficient to state a claim under section 1983.  Goldsmith v. Mayor and City Council of Baltimore, 987 F.2d 1064, 1071 (4th  Cir. 1993); Flittie v. Solem, 827 F.2d 276, 281 (8th Cir. 1987); Gill v. Mooney, 824 F.2d 192, 194 (2d Cir. 1987).  The prisoner plaintiff must sufficiently allege facts establishing that the actions taken against him were in retaliation for filing lawsuits and accessing the courts.  Wright, 795 F.2d at 968.  He must allege facts showing that the allegedly retaliatory conduct would not have occurred but for the retaliatory motive.  Jackson v. Fair, 846 F.2d 811, 820 (1st  Cir. 1988).  Plaintiff must allege a causal link between the protected activity and the adverse treatment, and there must be at least a "colorable suspicion" of retaliation for a complaint to survive and proceed into discovery.  Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983).  Such a causal connection may be alleged by a chronology of events that create a plausible inference of retaliation. Cain v. Lane, 857 F.2d 1139, 1143 n.6 (7th Cir. 1988).

"[U]pon a prima facie showing of retaliatory harm, the burden shifts to the defendant official to demonstrate that even without the impetus to retaliate he would have taken the action complained of . . . ."  Hartman v. Moore, 547 U.S. 250, 260, 126 S. Ct. 1695, 64 L. Ed. 2d 441 (2006) (citation omitted); *see also* Mt. Healthy City Bd. of Ed. v. Doyle, 429 U.S. 274, 287 (1977).  In the context of a defendant's motion for summary judgment, however, the plaintiff has the ultimate burden of proof; therefore, the defendant need only point to evidence as to the legitimate reason, and the plaintiff must produce "affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive."  Crawford-El, 523 U.S. at 600 (citing

Liberty Lobby, Inc., 477 U.S. at 256–57).  "The relevant showing . . . must be more than the prisoner's 'personal belief that he is the victim of retaliation.'"  Johnson v. Rodriguez, 110 F.3d 299, 310 (5th Cir. 1997) (quoting Woods v. Edwards, 51 F.3d 577, 580 (5th Cir. 1995)).  Appropriate deference should be afforded to prison officials "in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory."  Pratt v. Rowland, 65 F.3d 802, 807 (9th Cir. 1995) (citing Sandin v. Conner, 115 S. Ct. 2293, 2299 (1995)).  And, because regulatory actions taken by prison officials are presumed to be reasonable, the inmate must produce "specific, nonconclusory factual allegations that establish improper motive causing cognizable injury."  Crawford-El, 523 U.S. at 598 (citation omitted); Harris v. Ostrout, 65 F.3d 912, 916–17 (11th Cir. 1995); see also Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995) (because claims of retaliation may be easily fabricated, they should be reviewed with skepticism).  To defeat a summary judgment motion, a plaintiff need not adduce clear and convincing evidence of improper motive, Crawford-El, 523 U.S. 574, but he must produce evidence from which a jury could find by a preponderance of the evidence, that retaliation was the but-for cause of the challenged action.

"If there is a finding that retaliation was not the but-for cause of the action complained of, the claim fails for lack of causal connection between unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's mind."  Hartman, 547 U.S. at 260 (citing Mt. Healthy, 429 U.S. at 287); Crawford-El, 523 U.S. at 593.  Indeed, "action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway."  Hartman, supra (citing Crawford-El, 523 U.S. at 593; Mt. Healthy, 429 U.S. at 285–85).  However, when nonretaliatory grounds are in fact insufficient to provoke the adverse consequences, retaliation is subject to recovery as the but-for cause of official action offending the Constitution.  Id. (citation omitted).

C.      Eighth Amendment Standard

Plaintiff also claims that Defendants' arranging the attack on him violated his Eighth Amendment protection from cruel and unusual punishment.  The "unnecessary and wanton infliction of pain" constitutes cruel and unusual punishment prohibited by the Eighth Amendment.  Whitley v. Albers, 475 U.S. 312, 319, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986) (quoting Ingraham v. Wright, 430 U.S. 651, 670 (1977) (internal quotation omitted)).  To prove a violation of the Eighth

Amendment, a prisoner must show that the alleged deprivation was objectively serious sufficient to be of constitutional concern, and that the prison official acted with a sufficiently culpable state of mind by knowing of and disregarding an excessive risk to the prisoner's health or safety.  Farmer v. Brennan, 511 U.S. 825, 834, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).

       D.       Supervisory Liability

Supervisory officials are not liable under section 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability.  *See* Cottone v. Jenne, 362 F.3d 1352, 1360 (11th Cir. 2003) (internal quotation marks and citations omitted).  Supervisory liability may occur, however, either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation.  *Id.* (citation omitted).  This connection may be established "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so, or when a supervisor's custom or policy 'result[s] in deliberate indifference to constitutional rights' or when facts support 'an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.'"  *Id.* (internal quotation marks and citations omitted); Wayne v. Jarvis, 197 F.3d 1098, 1105 (11th Cir. 1999).

Isolated incidents are generally insufficient to establish a supervisor's liability; indeed, the deprivations must be "'obvious, flagrant, rampant and of continued duration . . . .'"  Gray ex rel. Alexander v. Bostic, 458 F.3d 1295, 1308 (11th Cir. 2006) (quoting Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999)).  Furthermore, filing a grievance with a supervisory person does not alone make the supervisor liable for the allegedly violative conduct brought to light by the grievance, even if the grievance is denied.  Wayne, 197 F.3d at 1106; Weaver v. Toombs, 756 F. Supp. 335, 337 (W.D. Mich. 1989), *aff'd*, 915 F.2d 1574 (6th Cir. 1990); *see also* Bellamy v. Bradley, 729 F.2d 416, 421 (6th Cir. 1984).  Knowledge imputed to the supervisor "must be so pervasive that the refusal to prevent harm rises to the level of a custom or policy of depriving inmates of their constitutional rights."  Tittle v. Jefferson County Com'n, 10 F.3d 1535, 1542 (11th Cir. 1994).  The failure to act or implement policy must be in the face of repeated violations or other indicators signifying a strong likelihood that the situation will recur.  *See* Harris v. City of Marion,

79 F.3d 56, 58–59 (7th Cir. 1996).  Supervisors are generally entitled to rely on their subordinates to respond appropriately to situations absent clear or widespread evidence to the contrary.  "The standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous."  Cottone, 362 F.3d at 1360 (internal quotation marks and citation omitted).

      E.      Qualified Immunity

      Defendants assert they are entitled to qualified immunity from suit in their individual capacities.  The doctrine of qualified immunity is a guarantee of fair warning.  McElligott v. Foley, 182 F.3d 1248, 1260 (11th Cir. 1999).  It shields government officials from individual capacity suits against them for acts that do not violate a clearly established statutory or constitutional right of which a reasonable person would have known given the circumstances and information possessed by the official at the time of the conduct.  Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002); Conn v. Gabbert, 526 U.S. 286, 290, 119 S. Ct. 1292, 1295, 143 L. Ed. 2d 399 (1999) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)); Powell v. Ga. Dep't of Human Resources, 114 F.3d 1074, 1077 (11th Cir. 1998).  Qualified immunity seeks to ensure that individuals can reasonably anticipate when their conduct may give rise to liability, and hence, liability only attaches if the contours of the right allegedly violated are sufficiently clear that a reasonable person would understand that what he is doing violates that right.  McElligott, 182 F.3d at 1260 (citing United States v. Lanier, 520 U.S. 259, 270, 117 S. Ct. 1219, 137 L. Ed. 2d 432 (1997)).

      In order to receive qualified immunity, the public official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."  Lee v. Ferraro, 284 F.3d 1188, 1194 (internal quotation marks omitted).  "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate."  Id. at 1194.  The Supreme Court has established a two-part test for evaluating a claim of qualified immunity.  First, the trial court must determine whether a constitutional right has been violated on the facts alleged.  Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001).  The court must assess the facts in a light most favorable to the party asserting the injury.  Id.

Second, if a violation has been established, the court must determine whether the right was "clearly established."  *Id.*  The very action in question need not have been held unlawful for an official to lose the protection of qualified immunity.  Hope, 536 U.S. 739; Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).  Officials can still be on notice that their conduct violates established law even in novel factual circumstances, and there is no requirement that previous cases be "fundamentally" or even "materially" similar.  Hope, 536 U.S. at 739.  Instead, the law merely must give Defendants "fair warning" that their actions are unconstitutional.  *Id.*  In light of pre-existing law, the unlawfulness must be apparent.  *Id.*; Creighton, 483 U.S. at 640.  "In this circuit, the law can be 'clearly established' for qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose."  Wilson v. Strong, 156 F.3d 1131, 1135 (11th Cir. 1998) (quoting Jenkins v. Talladega City Bd. of Educ., 115 F.3d 821, 826 n.4 (11th Cir. 1997)).

In cases where improper motive is an element of the constitutional claim, a defendant is entitled to qualified immunity only when, among other things, "the record indisputably establishes that the defendant in fact was motivated, *at least in part*, by lawful considerations."  Stanley v. City of Dalton, Ga., 219 F.3d 1280, 1296 (11th Cir. 2000); *see also* Foy v. Holston, 94 F.3d 1528, 1535 (11th Cir. 1996) ("the record makes it clear that Defendants' acts were actually motivated by lawful considerations without which they would not have acted.").

IV.   CONCLUSIONS OF LAW REGARDING MATERIAL FACTS

In determining whether evidence may be considered on summary judgment, the court is mindful of the standard regarding the consideration of hearsay statements included in verified pleadings, affidavits, documents, and other materials submitted pursuant to Rule 56.  The general rule is that inadmissible hearsay, meaning an out-of-court statement presented for the purpose of establishing the truth of the content of the statement and that does not fall within an exception to the hearsay rule, may not be considered on a motion for summary judgment.  Macuba v. Deboer, 193 F.3d 1316, 1322 (11th Cir. 1999) (citation omitted).  The court may consider "'otherwise admissible evidence to be submitted in inadmissible form at the summary judgment state, though at trial it must be submitted in admissible form.'"  *Id.* at 1324 (quoting McMillian v. Johnson, 88 F.3d 1573, 1584–85 (11th Cir. 1996)).  The "inadmissible form" in which the "otherwise admissible" evidence

may be submitted is a kind of evidentiary material listed in Rule 56(c), namely, the pleadings, the discovery and disclosure materials on file, and any affidavits.[1]  *See* <u>Celotex</u>, 477 U.S. at 324 (citing Rule 56).  Furthermore, an out-of-court statement made to a Rule 56 affiant or deposition deponent must be admissible at trial for some purpose, "[f]or example, the statement might be admissible because it falls within an exception to the hearsay rule, or does not constitute hearsay at all (because it is not offered to prove the truth of the matter asserted), or is used solely for impeachment purposes (and not as substantive evidence).  <u>Macuba</u>, 193 F.3d 1323–24 (footnotes omitted).  Thus, if a hearsay statement is offered for its truth and would not be admissible at trial under an exception to the hearsay rule, it may not be considered on summary judgment.  *See id.* at 1325.  This is true even though the hearsay statement might be admissible at trial for impeachment, because to be considered on summary judgment, the statement must be admissible as substantive evidence.  *Id.* (citing <u>McMillian</u>, 88 F.3d at 1584).  Finally, "Rule 56(e)'s personal knowledge requirement prevents statements in affidavits based, in part, 'upon information and belief—instead of only knowledge—from raising genuine issues of fact sufficient to defeat summary judgment." <u>Pace v. Capobianco</u>, 283 F.3d 1275, 1278 (11th Cir.2002).  In light of this standard, the undersigned reviewed all of the parties' submissions to determine whether the material conformed to the Rule 56 standard.

      A.     Defendant Pippin

Plaintiff provides three pieces of evidence to support a basis for liability for Defendant Pippin with regard to the retaliation claim.  First, Plaintiff states that on December 15, 2004, he was interviewed by Defendant Pippin as part of an investigation of Plaintiff's complaint that he was receiving disciplinary reports in retaliation for filing grievances, and Pippin told him to stop filing grievances against staff because "You might need these officers one day." (Doc. 170, Ex. A, O'Bryant Aff. ¶¶ 20–21).  Second, Plaintiff alleges that on April 29, 2005, after the attack by Inmate Lewis, Officer Hires asked Plaintiff if he was the one who "got jumped on" that day (*id*. ¶¶ 78–80).  When Plaintiff responded affirmatively, Hires asked who broke up the fight (*id*. ¶¶ 81–83).  When

---

[1]However, the party opposing a summary judgment motion may not rely merely on allegations or denials in its own pleading; rather, its response must "by affidavits or as otherwise provided in [Rule 56,]" set out specific facts showing a genuine issue for trial.  Fed. R. Civ. P. 56(e)(2).

Plaintiff responded that confinement officers broke it up, Hires stated, "You might want to think about that," and that Plaintiff was lucky that the officers who were working were officers that Plaintiff had not filed grievances against, because if certain other officers had been working, things may have been different (*id.* ¶¶ 84–85).  Plaintiff states that Hires then stated, "We're required to respond, but sometimes we're not in a hurry if it's something we're really not interested in stopping. . . . You might want to think about it before you write up officers.  You may need us again one day." (*id.* ¶ 86).  Third, Plaintiff alleges that on December 13, 2004, Defendant Finch came to Plaintiff's cell to conduct a cell search and stated, "So, you want to write grievances . . . . Here's lesson one about how we handle grievance writers at Holmes C.I." (*id.*, ¶¶ 10–11).  Defendant Finch then allegedly told Plaintiff to meet him behind the confinement curtain for "lesson two" about filing grievances, whereupon Finch told Plaintiff he had been instructed by "up front" to tell Plaintiff that it was time to stop filing grievances (*id.* at ¶¶ 11–12).

In his affidavit submitted with Defendants' prior summary judgment motion, which Defendants specifically adopt and incorporate by reference into the instant summary judgment motion (*see* Doc. 164 at 2), Defendant Pippin denies that he ever made the statement to Plaintiff on December 15, 2004, or that he discouraged Plaintiff in any manner from filing grievances (Doc. 37, Affidavit of Royce A. Pippin ¶ 5).  Defendant Pippin states he had no involvement in the decision to move Inmate Lewis into Plaintiff's cell, that those decisions are usually made by housing staff, not colonels, and that he did not direct anyone to place any inmate in Plaintiff's cell (*id.* ¶ 6).  Pippin further attests that he has no knowledge of any staff ever arranging for an inmate to assault Plaintiff in retaliation for filing grievances or lawsuits, nor did he have any information that would have led him to believe that any staff would take any retaliatory action against Plaintiff (*id.*).  Defendant Pippin states he is unaware of any informal or formal grievances from Plaintiff that were addressed to him or forwarded to him for a response (*id.*).  Pippin attests that he has never retaliated in any fashion against Plaintiff or any other inmate for filing grievances, lawsuits, or for any other reason, and he would never condone nor tolerate such behavior (*id.* ¶ 7).

Defendants also submitted Defendant Finch's declaration in which he denies that he made any statements attributed to him by Plaintiff (Doc. 167, Ex. A, Finch Decl. ¶ 5), and they submitted an affidavit of Officer Hires in which he states that although he may have talked to Plaintiff on April

29, 2005, he did not recall doing so, and if he had talked to Plaintiff, he "certainly wouldn't have made the type of statements [Plaintiff] alleges that I made" (Doc. 167, Ex. H, Affidavit of Otis Hires).

Although the undersigned concluded in the previous Report and Recommendation on Defendants' first summary judgment motion that the parties' submissions left open the possibility that Officer Hires's statements to Plaintiff could be reduced to admissible form at trial and, therefore, could be considered on summary judgment, the affidavit of Officer Hires's submitted by Defendants with the instant summary judgement motion changes that determination.  Officer Hires's additional affidavit states unequivocally that he did not make the alleged statements to Plaintiff, that is, he did not tell Plaintiff that he was lucky that the officers who responded to the attack were not officers that Plaintiff had filed grievances against, because officers respond less quickly if the victim/inmate has filed grievances against them.  Thus, it is clear that Hires's statements to Plaintiff could not be reduced to admissible form, that is, direct testimony, at trial.  Furthermore, it is now clear that Plaintiff could not offer Hires's hearsay statements at trial as substantive evidence that officers at HCI retaliated against inmates for filing grievances.  The statements are hearsay because they are out-of-court statements offered as substantive evidence of the truth of their content, and Plaintiff has failed to show that they qualify under an exception to the hearsay rule.  Furthermore, even if the hearsay statements could be offered at trial for impeachment purposes, such impeachment evidence is not substantive evidence and, therefore, may not be used to create a genuine issue of fact for trial for summary judgment purposes.  *See* McMillian, 88 F.3d at 1584.

Accordingly, for summary judgment consideration, this leaves only the disputed allegations that in December of 2004, Defendant Pippin interviewed Plaintiff as part of an investigation of Plaintiff's complaint that he was receiving disciplinary reports in retaliation for filing grievances, and Defendant Pippin told Plaintiff to stop filing grievances against staff because "You might need these officers one day," as well as the disputed allegation that on December 13, 2004, Defendant Finch referred to how "we . . . at Holmes C.I." handle grievance writers and that he (Finch) had been instructed by "up front" to tell Plaintiff that it was time to stop filing grievances.  Viewing this evidence in the light most favorable to Plaintiff, although it is sufficient to support an inference that Defendant Pippin discouraged Plaintiff from filing grievances, it is insufficient to support an

inference that there was a history of widespread retaliation that put Defendant Pippin on notice of the need to correct it, that Pippin had a custom or policy that resulted in deliberate indifference to Plaintiff's right to be free from retaliation, or that Defendant Pippin directed his subordinates to retaliate, or knew that they would retaliate and failed to stop them from doing so.  Therefore, the undersigned concludes that there exists no triable issue of fact regarding Defendant Pippin's liability on Plaintiff's First Amendment claim, and Defendant Pippin is entitled to judgment as a matter of law.[2]

> B.       Defendants Langford and Segers

In their summary judgment motion, Defendants contend that Inmate Lewis was moved into Plaintiff's cell in preparation for the painting of cells in the housing unit, and that Defendants were not responsible for the decision to move Inmate Lewis into Plaintiff's cell (Doc. 164 at 3–4). Defendants further contend that Inmate Lewis attacked Plaintiff because he was angry and annoyed at Plaintiff, not because Defendants asked him to attack him.

As evidence that the reason for the move was to paint Lewis's cell, Defendants offer the affidavit of Defendant Durrance in which he states that in April of 2005, he instructed Sergeant White and other confinement sergeants to move inmates at their convenience for the purpose of emptying cells so the maintenance crew could paint them (Doc. 37, Ex. G, Affidavit of Jesse Durrance ¶ 3).  Defendant Durrance states he never instructed any sergeants or officers to move Inmate Lewis into Plaintiff's cell so that Lewis could attack Plaintiff (*id.*).

Defendants also submitted affidavits of Michael White, who was assigned as Disciplinary Confinement Sergeant on April 27, 2005 (Doc. 167, Ex. C, Affidavits of Michael S. White). Sergeant White attests that Inmate Lewis was moved to cell #H2118U in preparation for the painting of cells in the disciplinary confinement unit (*id.*).  White further attests that moves of several other inmates were planned that day, but the paint crew indicated they would not be there that day, so no other moves were made (*id.*).  Sergeant White states that during the two-week period prior to April 27, there were numerous moves throughout the disciplinary confinement unit, and inmate movement

---

[2]The court previously granted summary judgment for Defendant Pippin on Plaintiff's Eighth Amendment claim (*see* Doc. 77).

continued even through June of 2005 to accommodate the paint and maintenance crews (*id.*). Sergeant White states that Defendant Durrance generally instructed him to move inmates as needed for the specific purpose to make cells available for painting by the paint crews, but Durrance did not specifically name any inmate and did not specifically instruct him on where or when to move inmates in order to accommodate the paint crews (*id.*).

Defendants also submitted affidavits of Officer Robert Long, the officer who Plaintiff alleges moved Plaintiff's cellmate out of their cell to make room for Lewis.  Officer Long states that he assisted in the moves that occurred on April 27, 2005, and the moves were made to empty cells so they could be painted (Doc. 167, Ex. D, Affidavits of Robert Long).  Long states that Defendant Durrance notified the wing sergeant that appropriate moves were authorized to make cells available for painting, but Durrance did not order any specific inmate be placed in any specific cell (*id.*). Long states that if he was asked about the movements that day, he may have stated it was at the direction of Defendant Durrance, but he did not intend any such statement to be interpreted that Durrance had specifically selected which inmates would be moved and where (*id.*).  The wing movements were determined by wing staff (*id.*).  Defendants submitted documents showing that work crews were in the confinement unit on April 20–22, 2005 (Doc. 167, Ex. E)

As further evidence that Defendants did not move Inmate Lewis into Plaintiff's cell to attack Plaintiff or otherwise arrange for the attack, Defendants submitted the deposition transcript of Larry Lewis.  In his deposition, Mr. Lewis states that he did not want to be moved from his original cell #H2105 to another cell because he liked his roommate in #H2105, Jonathan Dunn (Doc. 168, Deposition of Larry Lewis, p. 8, lines 23–25, p. 9, lines 1–9, 23–25). Mr. Lewis states that he asked Defendant Langford why he was moved, and Langford said he did not know (*id.*, p.12, lines 21-25, p. 13, line 1).  Mr. Lewis states he was angry about being moved from his cell, so angry that he could not eat and gave Plaintiff his food trays (*id.*, p. 11, lines 14–24, p. 13, lines 8–25, p. 14, lines 1–2). Lewis states that he was comfortable with his former cellmate, and Plaintiff paced a lot, which was "very annoying" (*id.*, p. 13, lines 20– 25, p. 14, lines 1–2).  Mr. Lewis states that he was so upset with the move, that he decided he would hit Plaintiff in order to be moved out of Plaintiff's cell (*id.*, p. 14, lines 3–11).  Lewis further states that he signaled to Mr. Dunn that he was going to hit Plaintiff, and that he wanted Dunn to yell for officers so he (Lewis) would not get carried away

since he just wanted to be moved (*id.*, p. 15, lines 12–25, p. 16, lines 1–25).  Mr. Lewis states that
after he attacked Plaintiff, he requested that he be placed with his former roommate, Mr. Dunn, so
there would not be any more problems, and staff moved Lewis into a cell with Mr. Dunn (*id.*, p. 19,
lines 9–24).  Lewis states that at some time after the attack, he saw Plaintiff in the recreation yard
and apologized for the attack (*id.*, p. 25, lines 21–25, p. 26, lines 1– 16).  Lewis states that he told
Plaintiff that if he (Plaintiff) wanted to harm him in return for the attack, "we can do it right here,
right now" (*id.*, p. 26, lines 3–8).  Lewis further states that none of the Defendants in this case ever
asked him to beat up Plaintiff (*id.*, p. 22, lines 12–18).  Finally, Mr. Lewis states he saw maintenance
crews painting cells in the wing both before and after he attacked Plaintiff (*id.*, p. 20, lines 3–8).

Defendants additionally submitted Defendant Langford's affidavit.  Defendant Langford
states he had no involvement in the decision to move Inmate Lewis into Plaintiff's cell, and he was
not working during the shift when Lewis was moved (Doc. 37, Ex. F, Affidavit of Jason Langford
¶ 3; *see* Doc. 164 at 2).  He further states he had no authority to direct other officers or sergeants to
move inmates from cell to cell (*id.*).  Defendant Langford states that he did not ask Lewis to attack,
jump, or harm Plaintiff in any manner, and he is not aware of any staff being involved in any
retaliation toward Plaintiff (*id.*).

In Defendant Segers's affidavit, he states that he did not have anything to do with the
movement of Inmate Lewis into Plaintiff's cell (Doc. 37, Ex. J, Affidavit of Ronnie Segers ¶ 4; *see*
Doc. 164 at 2).  He states he was not working during the shift when Lewis was moved to Plaintiff's
cell, nor did he direct anyone to move Lewis to Plaintiff's cell (*id.*).  Defendant Segers states he
never directed, asked, or requested Lewis to attack Plaintiff (*id.*).

To rebut Defendants' claim that Inmate Lewis was moved to cell #H2118 to accommodate
the paint crew, Plaintiff submitted Daily Movement Sheets reflecting the moving of inmates at HCI
for the two-week period prior to Lewis's attack (*see* Doc. 170, Ex. M).  The disciplinary
confinement unit is wing 2 of the H dorm; thus, cells in the disciplinary confinement unit are
identified on the Daily Movement Sheets as beginning with H2 (*see* Doc. 167, Ex. F; Doc. 170 at
25, Ex. M).  Plaintiff states that according to the Daily Movement Sheets, during the two-week
period prior to April 29, the day of Lewis's attack on Plaintiff, only one cell in the disciplinary
confinement unit was actually emptied, cell #H2109, on April 20, 2005 (*see* Doc. 170 at 24–26, Ex.

M).  Additionally, only Inmate Lewis was moved from cell #H2105 on April 27; Lewis's cellmate remained in that cell until April 29, when he and Lewis were both moved to cell #H2220 after Lewis's attack on Plaintiff (*id*. at 26–27, Ex. M-15; *see* Doc. 167, Ex. F).  Plaintiff questions why Lewis was not placed in #H2117 instead of moving Plaintiff's roommate to that cell, and he questions why the Daily Record of Segregation for Inmate Lewis does not state the reason for Lewis's move (Doc. 170 at 27–28, Ex. P).  Finally, Plaintiff asserts that prison records show that on April 26, there were multiple bunks available to move Lewis to without moving him to Plaintiff's cell; specifically, there were five cells that were completely empty, and five cells occupied by only one inmate (*id*. at 28, Ex. Q).

As evidence of Defendants Segers and Langford's involvement in the attack by Inmate Lewis, Plaintiff states that in December of 2004 he filed a grievance against Segers, and Segers returned the grievance to Plaintiff on the evening of December 10, 2004 (Doc. 170, Ex. A, O'Bryant Aff. ¶¶ 8–9).  Plaintiff additionally states that four or five days prior to the attack, he filed a grievance against Langford and Segers (*id*. ¶ 92).  Plaintiff alleges that on the evening of April 27, the day Inmate Lewis was moved into his cell, Defendant Segers stopped at the cell when Lewis was standing at the cell door and asked Lewis, "You're gonna handle that for us?" (*id*. ¶¶ 55–56).  As additional evidence of Defendant Langford's involvement, Plaintiff states that when he asked Inmate Lewis why he was moved out of his previous cell, Lewis responded that he had a "call out" from "up front" about the move earlier that day, and that he would be back in a cell with his last cellmate in a couple of days (*id*. ¶¶ 40–41).  Plaintiff states Lewis also stated that he believed he was moved to Plaintiff's cell by mistake because he understood he was being moved to cell #H2117 (*id*. ¶ 43).  Plaintiff alleges Lewis further stated he was moved because Durrance, Segers, Finch, and Langford wanted him to "jump" someone and "f[ ] him up because of the paperwork he's been filing" (*id*. ¶ 45).  Plaintiff states that later that evening, Defendant Langford made his rounds through the confinement unit where Plaintiff was housed and stopped at the cell occupied by Plaintiff and Inmate Lewis (*id*. ¶¶ 47–48).  According to Plaintiff, Langford asked Lewis if he remembered their conversation from the other day (*id*. ¶¶ 48–49).  Plaintiff alleges Lewis answered affirmatively, and Langford then told Lewis, "We still want you to handle that." (*id*. ¶¶ 49–50).  Lewis then stated, "But they put me in the wrong cell" (*id*. at 52), and Langford responded that the situation would be

straightened out and "Give it a day or two and you'll be back in a cell with your old roommate" (*id.* ¶ 53).  Langford then laughed and walked away (*id.* ¶ 54).

Plaintiff states that the next day, April 28, 2005, Defendant Langford stopped by his cell, and Inmate Lewis told him that he (Lewis) would be back in a cell with his former cellmate "tomorrow" (Doc. 170, Ex. A, O'Bryant Aff. ¶ 59).  Defendant Langford responded, "Yeah, tomorrow would be a good day." (*id.* ¶ 60).  Lewis said he would be back in a cell with his former roommate by about 12:30 p.m., and Langford responded, "that'd be a good time." (*id.* ¶¶ 61–62).

Plaintiff states that on April 29, 2005, at approximately 11:30 a.m., Inmate Lewis attacked him, and during the attack, Lewis yelled, "Segers, Finch, and Langford said to go ahead and file more grievances and lawsuits," and "You like to file paperwork, huh.  The police said file on this." (Doc. 170, Ex. A, O'Bryant Aff. ¶¶ 66–67).   Plaintiff states that the term "police" is used in the prison setting to refer to members of the correctional staff (*id.* ¶ 68).

Plaintiff alleges that on July 29, 2005, three months after the attack, Inmate Lewis apologized to him and told him that Pippin, Durrance, Segers, Finch, Langford, and other officers wanted him to attack Plaintiff, and if he attacked Plaintiff his remaining time at HCI would be easier (Doc. 170, Ex. A, O'Bryant Aff. ¶¶ 58, 90).  Plaintiff alleges Lewis told him that after the attack, Defendant Durrance thanked him for attacking Plaintiff (*id.* ¶ 101).  Plaintiff states he asked Lewis if he would be willing to be interviewed by Inspector Smith, and Lewis stated that he had already been interviewed by Smith and he (Lewis) told Smith what Defendant Durrance told him to say (*id.*).

In addition to his own affidavit, Plaintiff submitted an affidavit of Inmate Claude Hughes in which Hughes states that on April 27, 2005, he heard Defendant Langford laughing and stating to Inmate Lewis, "You know why you were moved.  Remember what I talked to you about the other day.  Handle that for me and Finch." (Doc. 170, Ex. R, Hughes Aff. ¶ 6).  Inmate Hughes, as well as Inmate Michael Anderson, attest that on April 28, 2005, they observed Langford approach the cell shared by Plaintiff and Inmate Lewis and state during a conversation with Lewis, "Yeah, tomorrow would be a good day . . . 12:30?  That'd [sic] be a good time" (*id.*, Hughes Aff. ¶ 7, Ex. B, Anderson Aff. ¶ 9).

Defendant Langford denies that he had the conversation with Inmate Lewis that Plaintiff alleges (Doc. 37, Ex. F, Langford Aff. ¶ 4).  Defendant Segers denies Plaintiff's allegation that he asked Inmate Lewis, "You're gonna handle that for us?" (Doc. 37, Ex. J, Segers Aff. ¶ 3).

Initially, the undersigned will address whether the evidence submitted by the parties may be considered on summary judgment.  The first category of evidence is statements by Defendants Segers and Langford that were overheard by Plaintiff, Claude Hughes, and Michael Anderson, specifically: (1) Defendant Langford's question to Inmate Lewis as to whether he remembered their conversation from the other day, (2) Langford's statements to Lewis on April 27, "You know why you were moved. . . . Remember what I talked to you about the other day. . . . Handle that for me and Finch" or "We still want you to handle that," (3) Langford's telling Lewis that the situation would be straightened out and "Give it a day or two and you'll be back in a cell with your old roommate," (4) Langford's statement to Lewis on April 28, "Yeah, tomorrow would be a good day," and "that'd be a good time," and (5) Segers's question to Lewis, "You gonna handle that for us?" Those statements are statements by party-opponents and, therefore, are not hearsay.  Fed. R. Evid. 801(d)(2).  Defendants argue that even if the statements may be admissible at trial, the statements are not direct evidence, at best, they may be used for impeachment; therefore, they may not be used to create a genuine issue of material fact (Doc. 164 at 31–32).  The undersigned disagrees with Defendants' contention that <u>McMillian v. Johnson</u> requires Plaintiff to produce direct evidence in order to create a genuine issue of material fact.  <u>McMillian</u> requires that the plaintiff submit <u>substantive</u> evidence, and substantive evidence may take the form of direct or circumstantial evidence.  Therefore, the fact that Defendant Langford's admissions are circumstantial evidence of his involvement in Lewis's transfer to Plaintiff's cell, instead of direct evidence, does not render them improper for consideration on summary judgment.

The next category of evidence is statements by Inmate Lewis, specifically: (1) Lewis's statement to Plaintiff on April 27, that he had a "call out" from "up front" about the move to Plaintiff's cell, and that he would be back in a cell with his last cellmate in a couple of days, (2) Lewis's statement to Plaintiff that he believed he was moved to Plaintiff's cell by mistake because he understood he was being moved to cell #H2117, (3) Lewis's statement to Plaintiff that he was moved because Durrance, Segers, Finch, and Langford wanted him to "jump" someone because of

the grievances the person had been filing," (4) Lewis's statement to Langford, "But they put me in the wrong cell," (5) Lewis's statement to Langford on April 28 that he (Lewis) would be back in a cell with his former cellmate "tomorrow . . . by about 12:30 p.m.," (6) Lewis's statement to Plaintiff on April 29, "Segers, Finch, and Langford said to go ahead and file more grievances and lawsuits . . . You like to file paperwork, huh.  The police said file on this," and (7) Lewis's statements to Plaintiff on July 29, 2005 that Segers and Langford were two of the staff members that wanted Plaintiff attacked.  All of these statements by Inmate Lewis are hearsay statements.  Plaintiff concedes that the statements are hearsay but argues that the statements may be considered under the "rule of completeness," which allows an entire conversation to be admissible so the jury may understand the context in which a defendant's statements were made (*see* Doc. 170 at 48). Plaintiff's argument is unconvincing.  "The rule of completeness was stated succinctly by Wigmore: '[T]he opponent, against whom a part of an utterance has been put in, may in his turn complement it by putting in the remainder, in order to secure for the tribunal a complete understanding of the total tenor and effect of the utterance.'"  <u>Beech Aircraft Corp. v. Rainey</u>, 488 U.S. 153, 171 n.14, 109 S. Ct. 439, 102 L. Ed. 2d 455 (1988) (quoting   7 J. Wigmore, Evidence in Trials at Common Law § 2113, p. 653 (J. Chadbourn rev. 1978)).  Thus it is clear that the rule permits Defendants to offer any remainder of their statements in the conversations with Lewis, but it does not permit Plaintiff to offer hearsay statements of a third party.  Accordingly, Plaintiff has failed to show that any of Inmate Lewis's hearsay statements may be considered on summary judgment.

This leaves for summary judgment consideration only the undisputed allegation that Plaintiff filed grievances against Defendants Segers and Langford prior to the attack by Inmate Lewis, the disputed allegations concerning Defendants' alleged statements to Lewis while he was in Plaintiff's cell, and information contained in the prison records.  Drawing all reasonable inferences in Plaintiff's favor, the undersigned concludes that Plaintiff has failed to produce sufficient evidence from which a jury could find by a preponderance that Defendants' retaliation was the but-for cause of the movement of Inmate Lewis into Plaintiff's cell or the but-for cause of the attack by Lewis.

Initially, the affidavits of Michael White and Robert Long, which were supplemented since Defendants' first summary judgment motion, clarify that the wing staff determined which particular

inmates would be moved to which cells on April 27, that they moved Lewis to Plaintiff's cell to prepare for paint crews, and that there were several other moves planned, but the paint crew indicated they would not be in the dormitory on the 27th (Doc. 167, Exs. C, D).  Furthermore, Larry Lewis testified during his deposition that paint crews were in the dormitory both before and after he attacked Plaintiff (Doc. 168, Lewis Deposition, p. 20, lines 3–8), and the prison records submitted by the parties show that work crews were in Plaintiff's dormitory on April 20, 21, and 22 (Doc. 167, Ex. E).  Also, Defendants Segers and Langford attest that they had nothing to do with the movement of Lewis to Plaintiff's cell.  To rebut this evidence, Plaintiff submits Langford's alleged comment to Lewis, "You know why you were moved."  Plaintiff also asserts that prison records show only one instance during the two-week period prior to Lewis's attack in which a disciplinary confinement cell was emptied and the inmates moved to another disciplinary confinement cell; however, the records also show that on April 26, the day before Sergeant White and Officer Long anticipated the presence of the paint crew, three additional cells were empty, and had been emptied during the two-week period prior to the attack (*see* Doc. 170, Ex. Q, Ex. M).  The fact that the inmates of the other three cells were moved to cells other than disciplinary confinement cells does not refute Defendants' evidence that cells in the disciplinary confinement unit were made available for painting during that two-week period.  Additionally, the fact that there were no maintenance or paint crews in Plaintiff's wing on April 27 and April 29 (*see* Doc. 170 at 44), does not refute Defendants' evidence that paint crews were in the wing after April 29 (Sergeant White and Inmate Lewis attested to this fact); nor does it refute the evidence that Sergeant White and Officer Long were in the process of emptying cell #H2105 to accommodate the paint crews, since the prison records show that after Lewis and his former cellmate were moved from cell #H2105 to cell #H2220 on April 29, cell #H2105 remained empty (*id*., Ex. M-15, M-36).  Viewing the evidence in Plaintiff's favor, Plaintiff has failed to produce sufficient evidence to create a genuine issue of material fact as to whether accommodation of the paint crews, as opposed to retaliation, was the reason for moving Inmate Lewis to Plaintiff's cell.

Additionally, the evidence is insufficient to create genuine issue of material fact as to whether retaliation was the but-for cause of Lewis's attack on Plaintiff.  Larry Lewis testified during his deposition that he beat up Plaintiff because he was angry and annoyed with him, and that none

of the Defendants asked him to beat up Plaintiff.  Although Plaintiff produced evidence that prior to Inmate Lewis's move to Plaintiff's cell, Defendant Langford and Lewis discussed Lewis's "handling" something, and while Lewis was in Plaintiff's cell, Segers asked Lewis if he was going to "handle that for us," and Langford told Lewis to "handle that for me and Finch" and that April 29 would be a good day for him to do so, this is insufficient to show by a preponderance that Defendants' conduct was the but-for cause of Lewis's attack on Plaintiff.  Accordingly, there does not exist a triable issue of fact as to Plaintiff's First or Eighth Amendment claim, and Defendants Langford and Segers are entitled to judgment as a matter of law.

      C.     Defendant Finch

As evidence of Defendant Finch's involvement in the alleged attack by Inmate Lewis, Plaintiff states that on December 13, 2004, Defendant Finch searched Plaintiff's property while he was housed in general population (Doc. 170, Ex. A, O'Bryant Aff. ¶ 10).[3]  Plaintiff states that Finch told him that the cell search was "lesson one" about filing grievances at HCI; Finch then ordered Plaintiff to meet him behind the disciplinary confinement curtain for "lesson two" about filing grievances (*id*. ¶ 12).  Behind the curtain, Finch told Plaintiff that Finch was instructed by "up front" to let Plaintiff know that it was time to stop filing grievances because it would not be tolerated much longer; and Finch then made several other unspecified threatening and harassing statements to Plaintiff (*id*. ¶ 12).  Plaintiff alleges that on December 16, 2004, while he was in administrative confinement, Defendant Finch stated, "I thought you were smart, Stupid.  That's alright, though. You're in my world now, O'Bryant." (*id*. ¶ 23).  On March 29, 2005, Plaintiff was again placed in confinement, and Defendant Finch came to Plaintiff's housing unit to inventory and pack up Plaintiff's property (*id*. ¶¶ 28, 29).  Included in Plaintiff's property was a draft of a federal civil rights complaint naming Finch as a defendant (*id*. ¶¶ 30, 31).  Nearly one month later, on April 24, 25, or 26, Defendant Finch stopped at Plaintiff's cell, opened the flap in the door, aggressively stared

---

[3]Plaintiff alleges that Defendant Finch was assigned to the disciplinary confinement unit at the time he searched Plaintiff's cell in general population; however, the facts do not suggest, nor has Plaintiff shown, that Plaintiff had personal knowledge of this fact.  Therefore, the court will not consider this fact in determining whether summary judgment is appropriate.

at Plaintiff, slammed the flap open, and stated, "When I packed your property, I saw a copy of a lawsuit with my name on it.  That was a huge mistake on your part" (*id*. ¶¶ 32, 33).

Plaintiff also submitted an affidavit of Inmate Fredrico Flemming in which Flemming asserts that he was present on December 13, 2004, when Defendant Finch told Plaintiff, "So, you want to write grievances against Segers and Gillman, huh.  Here's lesson one about how we handle grievance writers at Holmes C.I.," and then Finch began searching Plaintiff's locker, removing Plaintiff's property and legal work, reading the legal work, and throwing the property around the cell (Doc. 170, Ex. H, Affidavit of Fredrico Flemming ¶¶ 12, 13).  Inmate Fleming states that Defendant Finch then instructed Plaintiff to go behind the curtain that separates the open population from the confinement housing area so that Plaintiff could "learn lesson two about grievance writing at Homes C.I." (*id.* ¶ 14).

Plaintiff additionally submitted the affidavit of Inmate Hughes, discussed *supra*, in which Hughes states that on April 27, 2005, he heard Defendant Langford laughing and stating to Inmate Lewis, "You know why you were moved.  Remember what I talked to you about the other day.  Handle that for me and Finch." (Doc. 170, Ex. R, Hughes Aff. ¶ 6).  Plaintiff also submitted an affidavit of Inmate Michael Salkowski which states that on June 30, 2005, Officer Finch gave him a corrective consultation regarding a rule infraction (Doc. 170, Ex. L, Affidavit of Michael Salkowski).  During the consultation, Salkowski stated that he was going to write a grievance concerning the consultation, and Defendant Finch responded that he better not even think about doing so because he had already taken care of one inmate for writing grievances about him, and if Salkowski did write one, he (Finch) would make sure he received the same treatment as the other inmate (*id.*).

As further evidence of Defendant Finch's involvement, Plaintiff relies on the statements of Defendants Segers and Langford to Inmate Lewis regarding "handling" something for "us."  Plaintiff also relies on hearsay statements that the undersigned previously determined did not qualify for consideration on summary judgment, for example, statements by Inmate Lewis.

In his declaration submitted with Defendants' summary judgment motion, Defendant Finch denies Plaintiff's allegation that he searched Plaintiff's cell to harass him for filing grievances or for any other reason, except security reasons (Doc. 167, Ex. A, Finch Decl. ¶ 7).  Defendant Finch

specifically states that he did not make the statements that Plaintiff alleges he made (*id*. ¶ 5). Defendant Finch also states that he had no involvement in the decision to move Inmate Lewis into Plaintiff's cell on April 27, 2005 (*id*. ¶ 4).  Finch states he did not ask Lewis to attack or harm Plaintiff, and he is not aware of any staff being involved in any retaliation toward Plaintiff (*id*. ¶ 5). Defendant Finch states that he did not retaliate in any fashion against Plaintiff for filing grievances or lawsuits (*id*. ¶ 8).

Although Plaintiff has submitted evidence that Defendant Finch had retaliatory animus towards Plaintiff and made generally threatening statements to Plaintiff to discourage him from filing grievances, and that Defendant Langford told Inmate Lewis to "handle that for me and Finch" and that April 29 would be a good day to do so, this is insufficient to show by a preponderance that accommodation of the paint crew was not the but-for cause of moving Lewis to Plaintiff's cell. Likewise, this evidence is insufficient for a jury to find by a preponderance that Defendant Finch caused Lewis to attack Plaintiff, as opposed to Lewis's own feelings of anger and annoyance toward Plaintiff.  Accordingly, there does not exist a triable issue of fact, and Defendant Finch is entitled to judgment as a matter of law.


D.      Defendant Durrance

As discussed *supra*, Defendant Durrance states that in April of 2005, he gave instructions to Sergeant White and other confinement sergeants to move inmates for the purpose of emptying cells for painting (Doc. 37, Ex. G, Durrance Aff. ¶ 3).  Defendant Durrance states he was not working on the day that Inmate Lewis was moved into Plaintiff's cell, and he never instructed any sergeants or correctional officers to move inmate Lewis into a cell with Plaintiff so that Lewis could attack Plaintiff (*id*.).  Defendant Durrance further states he never told Lewis or anyone else that he wanted Lewis to attack Plaintiff because of paperwork, grievances, or lawsuits he had filed (*id*.). As discussed *supra*, Defendants have now submitted the affidavits of Sergeant White and Officer Long which state that Defendant Durrance did not specifically name any inmate to be moved or specifically instruct them on where or when to move inmates to accommodate the paint crew (Doc. 167, Ex C, White Aff., Ex. D, Long Aff).

As evidence of Defendant Durrance's involvement in the alleged attack by Inmate Lewis, Plaintiff states that he had filed a grievance against Durrance one month prior to Lewis's attack (Doc. 170, Ex. A, O'Bryant Aff. ¶ 93).  Plaintiff states that on the evening of the day when Inmate Lewis was moved into his cell, Defendant Segers stopped at the cell when Lewis was standing at the cell door and asked Lewis, "You're going to handle that for us?" (*id.* ¶¶ 55– 56), and Plaintiff relies upon Defendant Langford's statements, cited *supra*, which refer to "handling that for us." Plaintiff also relies upon the prison records, discussed *supra*, which show that there were other open beds in the wing to which Lewis could have been moved instead of Plaintiff's cell.  Plaintiff also submitted evidence that Officer Long told Plaintiff and his cellmate, Michael Anderson, that Anderson was being moved from Plaintiff's cell because Defendant Durrance wanted Inmate Lewis moved into Plaintiff's cell (*id.* ¶¶ 34–38; Ex. B, Anderson Aff. ¶¶ 3–6); however, alleged statements of Officer Long are hearsay that do not qualify under an exception to the hearsay rule.  Therefore, Officer Long's statements, as well as the hearsay statements of Inmate Lewis and Officer Hires, may not be considered on summary judgment.

Drawing all reasonable inferences in Plaintiff's favor, the undersigned concludes that Plaintiff has failed to produce sufficient evidence from which a jury could find by a preponderance that retaliation was the but-for cause of the movement of Inmate Lewis into Plaintiff's cell. Likewise, Plaintiff has failed to produce sufficient evidence from which a jury could find that Defendant Durrance caused the attack on Plaintiff,  especially in light of Lewis's deposition testimony that his anger and annoyance with Plaintiff was the reason for the attack.  Accordingly, there does not exist a triable issue of fact, and Defendant Durrance is entitled to judgment as a matter of law.

V.    CONCLUSION

Upon consideration of Plaintiff's claims and the evidence submitted, the undersigned concludes that Defendants are entitled to summary judgment on Plaintiff's First and Eighth Amendment claims.

Accordingly it is respectfully **RECOMMENDED**:

1.    That Defendants' motions for summary judgment (Doc. 164) be **GRANTED**.

2.    That final judgment be entered in Defendants' favor.

Case No.:  5:05cv131/RS/EMT

At Pensacola, Florida, this 11<u>th</u> day of March 2008.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations may be filed within ten (10) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**